UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MARSHALL SCHNEIDER,      )<br>          Plaintiff,            )<br>                                         )<br>     vs.                                )<br>                                         )<br>CARAUSTAR,                     )<br>          Defendant.            ) | 1:05-cv-1123-SEB-JPG |

**ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause comes before the Court on the Motion for Summary Judgment [Docket No. 32] filed by Defendant, Caraustar Industries, Inc. ("Caraustar"), pursuant to Federal Rule of Civil Procedure 56. Plaintiff, Marshall Schneider ("Schneider"), alleges that Caraustar violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, when it terminated his employment in November 2004 on the basis of his age. In its motion, Caraustar asserts that it is entitled to judgment as a matter of law because Schneider was not meeting its legitimate performance expectations and was not treated less favorably than similarly situated younger employees. For the reasons detailed in this entry, we now GRANT Defendant's Motion for Summary Judgment.

Factual Background

The employment relationship between Schneider and Caraustar began in October 2002, when Caraustar – a corporation that manufactures recycled packaging products – purchased a plant in Lafayette, Indiana, from Smurfit Stone Container Corporation

("Smurfit Stone").  Schneider was, at the time, the General Manager of the Smurfit Stone Lafayette plant and had previously worked for Smurfit Stone at its facilities in Michigan and Ohio.  Compl. ¶¶ 5-8.

When Caraustar purchased the Lafayette plant, it hired some Smurfit Stone employees to continue employment at the plant and offered severance packages to others.  Pl.'s Dep. Ex. 1.  Mike McMahon ("McMahon"), who then served as Caraustar's Vice President and Division General Manager of Uncoated Paperboard Packaging Mills, hired Gary Isbell ("Isbell") to serve as the plant's new General Manager.  Isbell had worked for McMahon and Caraustar previously and was forty-nine years old at the time he was hired at the Lafayette plant.  Isbell Dep. at 6 lns. 11-12.

Schneider asserts that he was "lead to believe" that he would be retained as General Manager.  Compl. ¶ 10.  Instead, McMahon offered Schneider a position as Plant Engineer,[1] which Schneider accepted.  In light of Schneider's previous salary as General Manager, McMahon offered to pay Schneider a salary of $125,000, which made Schneider the highest paid employee in his position.  McMahon Aff. ¶ 3.  Schneider was fifty-six years old at the time.  Schneider Dep. at 36 lns. 4-10.

As a Plant Engineer, Schneider was responsible for overseeing engineering, maintenance, boiler room, environmental reporting and purchasing at the plant as well as for managing other employees and outside contractors.  During the course of his

---

[1] Caraustar describes Schneider's position as "Plant Engineer"; Schneider refers to it as "Engineering Manager."  It is clear from the parties' briefs that they are referring to the same position.

employment, the number of employees who reported directly to Schneider ranged between approximately five and twenty.  Id. at 35 lns. 1-22.

Schneider reported to Isbell who in turn reported to McMahon.  Schneider testified that he got along well with both Isbell and McMahon during his employment.  Id. at 36 ln. 14 – 37 ln. 9.  Schneider maintains that throughout his employment with Caraustar he "was never disciplined for any reason and . . . was routinely told he was doing a good job."  Compl. ¶ 11; Schneider Aff. at ¶¶ 5-6.  Isbell testified that Schneider's "enthusiasm and energy [were] unsurpassed," but that his "safety performance was unacceptable" and that "he would take short cuts in . . . safety[.]"  Isbell Dep. at 18 ln. 12 – 19 ln. 9.  Isbell testified that he informed Schneider of his concerns about his safety performance "numerous times."  Id. at 18 lns. 12-13.  He cites, as one example of Schneider's poor safety record, an incident in which he received word that Schneider and a few other employees had conducted a job unsafely at a mill in Halifax, North Carolina, in which the crew operated a forklift while Schneider was standing on a pallet instead of using a safety cage.  Isbell Dep. at 20 lns. 17-25.

*Incidents at Caraustar's Buffalo Plant*

In May 2003, Schneider and a crew of employees from the Lafayette plant were sent to another Caraustar plant in Buffalo, New York, in order to assist in the removal and shipping of equipment being relocated to the Lafayette plant.  Schneider Dep. at 38 lns. 14-19; 40 ln. 23 – 41 ln. 3.  Upon his arrival, Schneider participated in a meeting by

3

speakerphone in order to finalize plans for the Lafayette crew's safety orientation. Other participants in the meeting included Earl Stecker, General Manager of the Buffalo plant, and Sheila Reagan, Safety Coordinator, neither of whom knew Schneider previously. During the phone call, Schneider reportedly asked how long the other participants were "going to tie [him] up in a safety meeting" and had a "general tone and demeanor . . . of anger and annoyance." Stecker Aff. ¶ 5, Ex. A.

During the safety orientation of the Lafayette crew, Stecker testified that Schneider "displayed contempt for the meeting and its requirements. He fidgeted, rolled his eyes, intentionally looked away from the speaker to a ceiling corner, and displayed disgusted facial expressions." Stecker Aff. ¶ 6. Stecker spoke with Schneider about his disregard for safety protocol and testified that he told Schneider "that his approach to safety would get someone hurt . . . [and] that if his actions did not change, he would have to leave the plant and contractors would be brought in to do his job." Id. ¶ 7.

In the course of the Lafayette crew's work at the Buffalo job, one of Schneider's crew members, Doug Moore, fell into a hole and was seriously injured. Moore fractured three ribs and punctured a lung, and was hospitalized for approximately four days as a result of the accident. Id. ¶ 8; Moore Dep. at 9 lns. 13-25. Stecker instructed Schneider that he and his crew were to leave the Buffalo plant and that any follow-up work would have to be done by someone else. Stecker also expressed dissatisfaction with Schneider's conduct to Isbell at the Lafayette plant. Stecker Aff. ¶¶ 8, 10.

*Schneider's Conduct Upon His Return to the Lafayette Plant*

Upon Schneider's return from Buffalo, Isbell met with him in order to discuss the safety-related incidents that had occurred there. Though McMahon believed Schneider's employment should be terminated based on those incidents, he deferred to Isbell's decision not to terminate Schneider, based on Isbell's belief that he could closely oversee Schneider's safety performance and encourage him to improve. Isbell Dep. at 22 lns. 15-25; 28 lns. 7-24. Isbell testified that he did not place any written report of the incident in Schneider's personnel file because Schneider was an experienced employee and former General Manager who knew the proper safety procedures. Id. at 24 lns. 2-8.

Isbell also testified as to another safety-related incident that occurred after his conversation with Schneider. Isbell observed contractors for whom Schneider was responsible driving a fork truck without heeding safety procedures. Isbell required the contractors to attend forklift training and safety orientation before resuming work and spoke with Schneider again about his safety performance. Isbell testified that he considered the incident "another kind of black mark on [Schneider] because he didn't push safety to the contractors[.]" Id. at 29 lns. 14-23, 31 at 9-14.

*The Asbestos Incident and Termination of Schneider's Employment*

On November 17, 2004, Schneider directed two crew members, George Dilk and Bill Bowsher, in removing insulation from around a tank prior to moving the tank to the maintenance shop. Schneider first directed Dilk to look for a nameplate on the tank,

5

which he did and delivered it to Schneider.  From the data on the plate, Schneider determined that the insulation around the tank consisted of calcium silicate.  Schneider then told Dilk to proceed with stripping the insulation from the tank.  Schneider Dep. at 54 lns. 7-24; Schneider Aff. ¶¶ 11-12.

While removing the insulation, Dilk and Bowsher became concerned that it contained asbestos.  Bowsher testified that he told Schneider about their concern and that Schneider informed Bowsher that he didn't think the insulation contained asbestos and that he and Dilk should continue removing it.  Bowsher Aff. ¶¶ 6-7.  Schneider, however, maintains that no employees informed him that they believed the tank contained asbestos until he spoke with Isbell and that he never instructed any employees to continue stripping the tank, despite their belief that it contained asbestos.  Schneider Aff. ¶¶ 13-14.  Bowsher and Dilk state that they informed their union representative, Thelma Whitlock, of their concerns, and Whitlock and Bowsher then informed Isbell. Bowsher Aff. ¶¶ 8-9.  Isbell then shut down the job, watered down the area in order to prevent any asbestos from floating in the air around the tank, and called Schneider back to the site.  He also called in an asbestos abatement service to remove and test the insulation.  Isbell Dep. at 32 lns. 8-16.  Isbell informed Schneider that he was suspended immediately and should return later that week to discuss his employment status.  Schneider described Isbell as being "very upset" during this meeting.  Schneider Dep. at 58 ln. 5.

The following day, the asbestos abatement facility reported that the samples had tested positive for asbestos.  Isbell testified that, upon learning this, he consulted with

6

McMahon and recommended that Schneider's employment be terminated. Isbell stated that "what really got me was . . . these guys told [Schneider] they were concerned there was asbestos in there. He didn't listen to the concerns, didn't go out there and investigate it, he just told them to keep working. It did turn out to be asbestos . . . even if he didn't have a record for poor safety, I would have terminated him over that[.]" Isbell Dep. at 33 lns. 11-19. McMahon suggested that Isbell discuss severance terms with Larry Hartsell, Human Resources Manager. Hartsell (who was approximately sixty-eight years old at the time) agreed that termination of Schneider's employment was appropriate. Hartsell Aff. ¶ 5. Schneider and Isbell met the next day and (following some negotiations over severance terms) Schneider's employment with Caraustar was terminated. Schneider was fifty-eight years old at the time and had been employed by Caraustar for two years. Schneider Dep. at 36 lns. 11-13, 63 lns. 5-10.

Schneider filed a complaint with the Equal Employment Opportunity Commission on April 1, 2005. On July 29, 2005, he filed suit against Caraustar alleging that his employment was terminated on the basis of his age in violation of the ADEA. On December 13, 2006, Caraustar filed its Motion for Summary Judgment, on which we now rule.

Legal Analysis

**I.     Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of

the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). Further, a failure to prove any single essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

The summary judgment standard is applied rigorously in employment discrimination cases because intent and credibility are such critical issues and direct evidence is rarely available. Seener v. Northcentral Technical Coll., 113 F.3d 750, 757 (7th Cir. 1997); Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 354 (7th Cir. 1996). To that end, we carefully review the record for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997). A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. Albiero v.

9

City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

## II. Schneider's ADEA Claim

### A. *The McDonnell Douglas Framework*

The ADEA, 29 U.S.C. § 621 *et seq.*, is intended to "promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b). Accordingly, it is unlawful under the ADEA for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a).

A plaintiff may prove a claim of age discrimination either by presenting direct evidence of discrimination or by proceeding under the McDonnell Douglas burden-shifting method of proof. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Schneider addresses only the McDonnell Douglas framework in his brief, so we proceed solely with that analysis. Under this method, a plaintiff must initially demonstrate a *prima facie* case of discrimination. If one can be established, the burden shifts to the defendant to articulate a nondiscriminatory reason for the actions it took against the plaintiff. If the defendant can offer a legitimate nondiscriminatory reason for the employment decision, the burden reverts to the plaintiff to show that there is a genuine

dispute of material fact that the proffered reason for the employment action is pretextual. Nese v. Julian Nordic Constr. Co., 405 F.3d 638, 641 (7th Cir. 2005).

Thus, our initial inquiry is whether Schenider demonstrates a *prima facie* case of age discrimination in violation of the ADEA. In order to do so, he must show: (1) that he was part of the class protected by the ADEA – that is, that he was over forty years old; (2) that he was meeting his employer's legitimate job expectations; (3) that he suffered an adverse employment action; and (4) that the circumstances surrounding the adverse action indicate that it is more likely than not that his age was the reason for it.[2] See Griffin v. Potter, 356 F.3d 824, 828 (7th Cir. 2004) (applying McDonnell Douglas framework to ADEA claim).

### B.     *Schneider's* **Prima Facie** *Claim*

The parties do not dispute that Schneider was over forty years old when his employment was terminated or that he suffered an adverse employment action (his discharge). Therefore, we need only address the second and fourth prongs of his *prima*

---

[2] The fourth prong may be proven by a demonstration that Schneider was treated less favorably than, or was replaced by, a similarly situated younger employee. There is support for this interpretation of the fourth prong in several Seventh Circuit cases. See, e.g., Rooney v. Koch Air, LLC, 410 F.3d 376, 380-81 (7th Cir. 2005); Amadio v. Ford Motor Co., 288 F.3d 919, 924 (7th Cir. 2001); Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 472 (7th Cir. 2002). However, the Seventh Circuit has also stated that this prong is not necessary "to make out a prima facie case, so long as there is some evidence from which one can infer that the employer took adverse action against the plaintiff on the basis of statutorily proscribed criterion." Leffel v. Valley Financial Svcs., 113 F.3d 787, 793 (7th Cir. 1997). To determine whether the circumstances suggest that the plaintiff's age was the reason the employer took adverse action against her, the plaintiff "may (not must)" demonstrate that "similarly situated . . . employees were treated more favorably." Timmons v. General Motors Corp., 469 F.3d 1122, 1127-28 (7th Cir. 2006).

*facie* claim.

In order to prove the second prong of a *prima facie* case under the McDonnell Douglas framework, a plaintiff must demonstrate that he or she was meeting the employer's legitimate performance expectations at the time her or she was terminated. See Peele v. Country Mut. Ins. Co., 288 F.3d 319, 329 (7th Cir. 2002). Schneider contends that "other similarly situated employees, who were significantly younger than Plaintiff, perform[ed] very poorly regarding safety" and were neither disciplined nor terminated. Pl.'s Resp. at 10. It appears, then, that Schneider is contending that Caraustar applied its employment expectations in a disparate manner and was harder on him than on other similarly situated employees. When a plaintiff raises such an argument, it is appropriate for us to consider the second and fourth prongs of a *prima facie* discrimination claim together. See Peele v. Country Mut. Ins. Co., 288 F.3d 319, 329 (7th Cir. 2002) ("When a plaintiff produces evidence sufficient to raise an inference that an employer applied its legitimate employment expectations in a disparate manner . . . the second and fourth prongs of McDonnell Douglas merge[.]").

Schneider describes two comparators whom he believes were treated more favorably than he.[3] Bob Black, who is currently thirty-two years of age, was given a 2004

---

[3] In his statement of facts, Schneider also mentions the safety record of Dick Turvey, though he never states Turvey's age or mentions him in the argument section of his brief. Therefore, it appears to us that Schneider has abandoned any argument that Dick Turvey was a similarly situated younger employee treated more favorably than he.

In addition, Schneider's Complaint mentions another Caraustar employee, Greg Gray, and his alleged failure to discover asbestos. However, Schneider nowhere mentions Gray in his
(continued...)

safety rating of "one," which is the worst possible rating; he was further informed in his evaluation that his accident rate was at an unacceptable level.  Black, like Schneider, reported to Isbell, but Black's employment was not terminated.  Pl.'s Resp. ¶¶ 18-27.

Black, however, is not a legitimate comparator to Schneider.  For one, the evaluation cited by Schneider was conducted by Isbell's successor, Charles Wall, after Isbell retired; Isbell did not use such forms and, in fact, testified that he would did not personally agree with such a safety rating for Black, based on his experience with him.  Isbell Dep. at 66 lns. 2-9.  The Seventh Circuit has held that "different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a *prima facie* case of discrimination for the simple reason that different supervisors may exercise their discretion differently. . . . These distinctions sufficiently account for any disparity in treatment, thereby preventing an inference of discrimination."  Radue v. Kimberly-Clark Corp., 219 F.3d 612, 618 (7th Cir. 2000).

Moreover, Schneider has not introduced evidence beyond these safety ratings to suggest that Black's record of unsafe conduct was comparable to his.  The uncontroverted evidence demonstrates that Schneider had safety-related performance issues with respect to the accident at the Buffalo plant, the contractor fork truck project at the Lafayette plant, and the asbestos incident.  In order for an employee to be similarly situated to a plaintiff

---

[3](...continued)
summary judgment pleadings, so we assume that Schneider has abandoned any comparison to Gray as well.

for purposes of McDonnell Douglas comparison, the comparator must be similar "in terms of performance, qualifications, and conduct. . . . This normally entails a showing that the two employees . . . had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Id. at 617-18.  No such showing has been made here.

Schneider also argues that Felix St. Pierre is a valid comparator for purposes of establishing his fourth prong.  St. Pierre was hired by Caraustar (according to Schneider, as his "replacement") as a Project Manager a few months after Schneider's dismissal, at the age of forty-six.  St. Pierre's job duties include "process improvement projects," boiler room management, working with outside contractors and machine shops, and several other duties that Schneider also completed.  Id. ¶¶ 38-44.  Schneider maintains that his replacement by a younger employee demonstrates that age discrimination was the likely cause of his dismissal.

However, as Caraustar points out, St. Pierre cannot be properly viewed as a comparator, as he has no responsibility for managing other employees or crew members, while Schneider was responsible for the supervision of up to twenty people.  St. Pierre's educational background is entirely different than Schneider's and his salary is approximately one-half of what Schneider earned.  In order to demonstrate that an employee is similarly situated, a plaintiff "must show that there is someone who is directly comparable to [him or] her in all material respects."  Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002).  This includes whether the plaintiff and the

comparator had comparable experience and job responsibilities and whether they reported to the same supervisor.  See Radue, 219 F.3d at 617-18.  Thus, St. Pierre cannot be considered to be "similarly situated" to Schneider.

Caraustar maintains that Schneider's safety performance was unacceptable, that it had informed him of this on at least two occasions prior to the asbestos incident, and that his employment had nearly been terminated after the accident at the Buffalo plant.  As the evidentiary record makes abundantly clear, Schneider was not meeting Caraustar's employment expectations with respect to his safety performance.  Though Schneider disputes the details of his conduct with regard to the asbestos incident,[4] he disputes neither that the incident occurred nor the numerous other safety-related performance problems that occurred in the course of his employment.  In addition, he has failed to demonstrate that he was treated less favorably than similarly situated younger employees.  The testimony of Isbell, Dilk, Bowsher, Hartsell, and McMahon all support Caraustar's assertion that it terminated Schneider's employment due to an honest and reasonable belief that he was not adequately meeting safety standards – and, critically, Schneider has not disputed this good-faith, reasonable reliance.  Because Caraustar honestly believed that Schneider was not meeting its legitimate employment expectations, "its business judgment will not be second-guessed by federal courts applying the ADEA."  McCoy v.

---

[4] Schneider testified in his deposition that he could not recall "the sequence of events" in which Bowsher informed him of his concerns about asbestos.  He stated that he thought this conversation occurred "after the fact" (presumably, after the asbestos exposure occurred). Schneider Dep. at 49 ln. 15 – 50 ln. 5.

15

<u>WGN Continental Broadcasting Co.</u>, 957 F.2d 368, 373 (7th Cir. 1992).

Therefore, because Schneider has failed to establish a *prima facie* case of discrimination under the ADEA, Caraustar's Motion for Summary Judgment is <u>GRANTED</u>. Final judgment shall be entered accordingly. IT IS SO ORDERED.

Date: _____04/30/2007_____

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Stephen Curtis DeVoe
PLEWS SHADLEY RACHER & BRAUN
cdevoe@psrb.com

Jonathan P. Emenhiser
PLEWS SHADLEY RACHER & BRAUN
jemenhiser@psrb.com

Jeffrey S. McQuary
BROWN TOMPKINS LORY
jmcquary@brown-tompkins-lory.com

Gregory A. Stowers
STOWERS & WEDDLE PC
gstowers@swh-law.com

Frederick L. Warren
FORD & HARRISON LLP
rwarren@fordharrison.com